## STATE v. GORDON SHAKE.

140 N. W. (2d) 341.

February 11, 1966—No. 39,628.

*Ben R. Toensing,* for appellant.

*Robert W. Mattson,* Attorney General, *Wood W. Remington,* Special Assistant Attorney General, and *John L. Plattner,* County Attorney, for respondent.

*Irving Clark, John J. McGirl, Jr.,* and *Doherty, Rumble & Butler,* for Minnesota Farmers Union and Farmers Union Marketing Association, amici curiae.

FRANK T. GALLAGHER, C.

This is an appeal from a judgment of conviction in the District Court of Cass County entered against Gordon Shake in 1964. He was charged with violating the provisions of Minn. St. 1961, § 35.08, and Minn. St. 35.30, which provide generally for testing bovine animals for Bangs disease and for appraisal and slaughter of animals found to be infected.

At the trial in district court, Dr. James Lawrence Schaefer, a veterinarian engaged in general practice in Staples, Minnesota, testified, among other things, that on April 18, 1963, while under contract with the Minnesota State Livestock Sanitary Board, he drew blood samples from 20 head of defendant's cattle. A sample from each cow was placed in a separate vial, numbered, and individually packed in a box, which was sent to the U. S. State-Federal Laboratory at Crookston, Minnesota, for the purpose of testing the blood samples drawn from the cattle.

Alfred Peterson, doctor of veterinary medicine, a witness for the state, testified that he was employed as a veterinarian by the U. S. Department of Agriculture since 1935 and was currently so employed in the State-Federal Laboratory at Crookston, where he works under both state and Federal direction and supervision. He has worked with brucellosis matters (Bangs disease) since 1934. He said that on April 23, 1963, he received a package from Dr. Schaefer containing blood samples of defendant's herd and that he was present when preliminary screening tests were made of the samples. After explaining in detail the testing methods used in the laboratory, he said that as a result of the brucellosis tests on defendant's cattle it was determined that the herd contained 11 reactor cattle.

Another veterinarian employed by the U. S. Department of Agriculture, Dr. Donald Werring, said that he received the test chart from Dr. Peterson, evaluated it, and made the diagnosis that defendant's herd contained 11 reactors, 2 suspects, and 7 negative animals. On April 29, 1963, Dr. Werring placed defendant's herd under quarantine at the latter's farm. Thereafter, on May 2, he and Dr. Schaefer returned to the farm, and the reactors were branded and tagged. He testified that on that date he left a "shipping permit form" (state's exhibit 5) with Mrs. Shake, wife of the defendant. He explained that it was a permit to ship branded cattle. The exhibit stated in part that permission was granted to Gor-

don Shake to ship the 11 cattle whose reactor and identification tags were listed thereon "FOR IMMEDIATE SLAUGHTER ONLY, to public stockyards or slaughtering establishments in Minnesota where the United States Bureau of Animal Industry maintains inspection," and that the permit was void after 15 days.

The witness also said that state's exhibit 6, an appraisal form in connection with defendant's cattle, was in his handwriting; that it was filled out the day the cattle were branded, May 2; that the original of that copy would be in the office of the U. S. Animal Disease Eradication Branch in St. Paul; that the copy was a true and accurate copy of the original, which was made out at defendant's farm. Exhibit 6 was signed: "D. N. Werring, U.S.A.D.E.D. Veterinary, Livestock Inspector." Over his signature, the exhibit stated in part that on May 2, 1963, in accordance with state law, the inspector had appraised separately and individually the animals described in the attached claim of Gordon Shake as currently breeding and utility value not to exceed $125 for grade females and $225 for registered animals. At the bottom of the exhibit was the following signed acceptance:

"The appraisal of the animal or animals described in the attached claim is accepted by me.

OWNER    Gordon Shake    ADDRESS    Staples
PER      Bernice Shake"

The witness said he did not give defendant Shake or his wife a copy of the exhibit.

State's exhibit 7, a State Livestock Sanitary Board's "APPRAISAL OR VALUATION AGREEMENT," was next presented to Dr. Werring. It read in part as follows:

"We have this 2 day of April 1963 appraised 11 animals condemned on account of Brucellosis."

The witness testified that he made out the document at defendant's farm on the day of the branding, May 2, 1963, and that the date April 2, 1963, was erroneous. The document listed "REACTOR" and "IDENTIFICATION" numbers and the "AMOUNT OF APPRAISAL" on the 11 animals at $125 each. The appraisers, listed in writing, were D. N. Werring, Gor-

don Shake, and Bernice Shake. The doctor said that exhibit 7 included the original and carbon copy as there were "just two copies involved"; that the carbon copy was a true and accurate copy of the original; and that the document, *with the exception of the appraisal,* was filled out in the house on the kitchen table at the Shake farm. He said that Mrs. Shake was there and that she signed it. He was asked by defendant's counsel in connection with laying a foundation for the exhibit:

"MR. TOENSING: * * * Was this instrument, Exhibit 7, signed in blank by Mrs. Shake without anything filled in on it?

"A. The appraisal was not filled in on it.

"MR. TOENSING: Anything else filled in?

"A. I would say not.

* * * * *

"MR. TOENSING: When she signed it?

"A. On that particular No. 7.

"MR. TOENSING: You testified it was in blank at the time?

"A. I would say so.

"MR. TOENSING: When it was signed?

"A. Yes, I would say so."

Exhibit 7 was admitted over objection of defendant's counsel.

In connection with the papers referred to in the above exhibits, Dr. Werring testified that prior to delivering the papers and obtaining the signature of Mrs. Shake he advised defendant that it would be necessary to make out papers on the cattle and that the latter replied: "I am in a hurry, have to go to the field. You go to the house and make it out and my wife will take care of the paper work." The witness said that he then went into the house, had a conversation with Mrs. Shake, and asked if she wanted to sign the papers. He was then questioned:

"Q. And what did she say to that?

"A. I can't tell you whether she said she would or wouldn't, but she did.

* * * * *

"Q. Now, after this day on May second, 1963, when you talked to

Mrs. Shake in the home on May second, 1963, did you advise her of these documents?

"A. I wouldn't say I advised. I explained each document. This is a disinfectant document, this is a shipping permit for these animals. These things were left there.

"Q. And did you have a conversation on that day concerning the appraising?

"A. I said that all these animals would be appraised at top value of 125 dollars."

Defendant has raised six legal issues and 12 assignments of error on appeal. We deem it unnecessary to pass on each of them. Rather, it appears to us under the record here that the real issue for our determination is whether the requirements of Minn. St. 1961, § 35.08, regarding valuation of animals to be destroyed were fulfilled by the State Livestock Sanitary Board. If not, then defendant could not have been guilty of violating Minn. St. 35.30 and could not have been sentenced under Minn. St. 35.70.

Section 35.08 (prior to its amendment by L. 1965, c. 472, not involved here) provided that when the board decided upon the killing of an animal affected with Bangs disease—

"* * * it shall notify the owner or keeper thereof of such decision and when, in the judgment of the board, such animal may be ordered transported for immediate slaughter by the board, through its executive officer, to any abattoir where the United States bureau of animal industry maintains inspection * * *."

It further provided:

"Before the animal is removed from the premises of the owner the representative or authorized agent of the board shall agree, in writing, with the owner as to the value of such animal; in the absence of such agreement, there shall be appointed three competent, disinterested men, one appointed by the board, one by the owner, and a third by the first two, to appraise such animal at its cash value, taking into consideration the condition of the animal as to the disease and its present and probable effect on the animal."

Minn. St. 35.30 provides:

"* * * The owner, or person in possession, shall immediately remove reacting cattle from the premises and cause the same to be slaughtered, as required by said board, within 15 days after date of appraisal * * *."

The complaint charged the criminal act of refusal by defendant to ship brucellosis-diseased (Bangs disease) cattle following orders to ship by claimed representatives of the board. It charged a criminal offense under the statute. Minn. St. 35.70, subd. 1, provides in part as follows:

"Every person violating any provision of this chapter * * * or any order made * * * under the authority of this chapter, shall be guilty of a misdemeanor, the minimum punishment whereof shall be a fine of $25 or imprisonment for 30 days."

It is our opinion upon a review of the record in this case that the requirements of § 35.08 regarding the procedure to be used in evaluating defendant's animals which were to be destroyed were not fulfilled by the board through its representatives or agents. Although § 35.08 provides that before the animal to be killed is removed from the premises of the owner the representative or authorized agent of the board shall agree *in writing* with the owner as to the value of the animal, it also provides that in the absence of such an agreement "there shall be appointed three competent, disinterested men, one appointed by the board, one by the owner, and a third by the first two, to appraise such animal at its cash value."

We cannot find any satisfactory evidence that the defendant agreed in writing with the representative or authorized agent of the board in the manner intended by the statute as to the value of the animals which the state ordered destroyed. The only testimony as to what took place on May 2, 1963, the date the purported appraisal agreement was allegedly signed by Mrs. Shake for her husband, was that of Dr. Werring. Neither defendant Shake nor his wife offered any testimony. In that connection, Dr. Werring testified that Mrs. Shake signed the alleged appraisal agreement and that, acting for her husband, she signed the form accepting the appraisal agreement of $125 for each of the 11 reactors. He further said that a shipping permit, which actually required that the reactors must be sold for immediate slaughter, was left with her. The witness said that he

explained the documents to Mrs. Shake and told her that "these animals would be appraised at top value of 125 dollars." However, on the doctor's own testimony, the appraisal price of $125 was not included in the document (exhibit 7) at the time Mrs. Shake signed it, but instead she signed it in blank.

It is our further opinion that, in the absence of such an agreement, there was no compliance with the provisions of § 35.08 requiring appointment of appraisers. There is no evidence that "three competent, disinterested men" were named in the manner required by the statute. To the contrary, the only indication of any appraisers is that shown in exhibit 7, where under the word "APPRAISERS" are the names D. N. Werring, Gordon Shake, and Bernice Shake. Surely they could not be considered "three competent, disinterested men, one appointed by the board, one by the owner, and a third by the first two" as required by the statute.

As there was no compliance by the board with the provisions of § 35.08, it follows that the defendant never had legal permission to ship his 11 head of cattle and therefore did not violate the statute in that respect. As a result, his conviction is reversed.

In view of our decision of these points, we need not pass on the constitutional matters raised by defendant and amici curiae.

Reversed.